**Marilyn PASCHAL, Appellant,**

v.

**GREAT WESTERN DRILLING, LIMITED, Appellee.**

No. 11–05–00101–CV.

Court of Appeals of Texas, Eastland.

Oct. 19, 2006.

Rehearing Overruled Dec. 14, 2006.

Billy G. Alexander, Law Office of Bill Alexander, Odessa, Kindra A. Johnson, Austin, for appellant.

Chris Aycock, Angela N. Staples, Cotton, Bledsoe, Tighe & Dawson, R. Brad

Miller, Kerr, Ward, McLaughlin & Miller, L.L.P., Michael C. Tighe, McKinney & Tighe, L.L.P., Midland, James M. Parker, Jr., Jerry L. McDowell, McDowell & Parker, Ltd., San Antonio, for appellee.

Panel consists of: WRIGHT, C.J., and McCALL, J.

## OPINION

TERRY McCALL, Justice.

This appeal arises from a lawsuit filed by an employer against the wife of a deceased employee in an attempt to recover a large sum of money stolen by the employee. The employer sought to impose a constructive trust on the proceeds of life insurance polices insuring the life of the deceased employee that named the wife as beneficiary. The employer also sought to obtain a money judgment against the wife based upon allegations that she conspired with her husband to steal the money. Lastly, the employer asserted that the wife committed the tort of conversion by collecting the proceeds of some of the life insurance policies. The jury made findings in support of all of the causes of action asserted by the employer, and the trial court entered a judgment that conformed with the jury's verdict. We affirm.

### Background Facts

Alan W. Paschal (Alan) worked as an accountant for Great Western Drilling, Limited (Great Western) for over twenty years. It is undisputed that he stole almost $1,500,000 from Great Western between 1991 and 2003. Alan committed the theft by diverting the payment of revenue received by Great Western to "M & A Royalty," a fictitious royalty owner that he created in Great Western's computer system. Some of Alan's coworkers discovered the theft in June of 2003. Alan died on June 23, 2003, as a result of a one-vehicle accident while he was trying to flee from an FBI agent.

Alan deposited the checks that he issued to M & A Royalty into an account that he maintained at Bank of America in Midland. Great Western's accounting expert testified that Alan spent the stolen funds that he deposited into the M & A Royalty account on living expenses, extremely large purchases of jewelry, clothing and other ladies' personal items, life insurance policies, mortgage payments, and hobbies relating to horses and other livestock. The expert also noted numerous cash withdrawals from the M & A Royalty account. The M & A Royalty account did not have a significant balance at the time of Alan's death.

In June 2000, Alan began paying premiums on the first of five "term" life insurance policies that provided death benefits in the total amount of $1,225,102.50 at the time of his death. Each of the policies named his wife, Marilyn Paschal (Marilyn), as the sole beneficiary. Alan paid all of the premiums for these policies from a joint account that he and Marilyn maintained at the Midland Community Federal Credit Union. Alan periodically transferred funds from the M & A Royalty account into the joint account. He also deposited the salary that he received from Great Western into the joint account. Great Western sought to impose a constructive trust on the life insurance proceeds to the extent that Alan used the stolen funds to pay the life insurance premiums. The parties presented extensive evidence in an effort to trace the portion of the stolen funds which Alan used to the pay the premiums. The jury found that all of the premiums on four of the policies were paid with funds that Alan stole from

Great Western.[1]

The jury found that Alan owed a fiduciary duty to Great Western and that he breached that duty by stealing funds from Great Western. The jury also determined that Alan committed fraud against Great Western. The jury found that Marilyn engaged in a civil conspiracy with Alan to commit these acts and assessed damages against her in the amount of $1,492,380.58 on the breach of fiduciary duty claim and $990,079 on the fraud claim.

Great Western also alleged that Marilyn converted a portion of the life insurance proceeds by obtaining payment of the policy benefits after Alan's death. The jury awarded Great Western damages in the amount of $775,096 on the conversion claim.

Based on the jury's findings, the trial court entered judgment in favor of Great Western. The trial court awarded Great Western equitable relief by imposing a constructive trust on all of the insurance proceeds remaining in Marilyn or her agents' possession. The trial court also entered a money judgment against Marilyn in the amount of $1,492,380.58 on the conspiracy claim.[2] Lastly, the trial court awarded an additional money judgment of $775,096 on the conversion claim.[3] Marilyn raises ten issues on appeal attacking the trial court's judgment.

*Preliminary Procedural Matter*

■ Marilyn alleges in her second, third, fourth, fifth, sixth, seventh, and eighth issues that the trial court erred submitting various questions in the court's charge. TEX.R. CIV. P. 278 requires the submission of jury questions that are supported by the written pleadings and the evidence. *See Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002). A trial court may refuse to submit a question to the jury if (1) there is no evidence; (2) there are no pleadings; or (3) the issue is uncontroverted. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986).

■ An objection to the submission of a question in the court's charge on evidentiary grounds is a challenge to the legal sufficiency of the evidence.[4] *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992) ("A trial court may refuse to submit an issue only if no evidence exists to warrant its submission"). While Marilyn bases her jury charge error issues on "no-evidence" grounds, she also asserts factual insufficiency grounds that there was "no evidence, and alternatively, insufficient evidence, to warrant the submission of said question." A party cannot base an objection to the submission of an issue in the court's charge on factual sufficiency

---

1. The trial court refused to submit a question to the jury regarding the payment of the premiums on one of the policies. We address the trial court's refusal to submit a question regarding this policy in our discussion of Marilyn's ninth issue.

2. The breach of fiduciary duty claim and the fraud claim were alternative theories of recovery by which Great Western sought to impose liability against Marilyn for civil conspiracy. Since the damage award for the breach of fiduciary duty claim was greater, the trial court entered judgment based upon this amount.

3. The judgment provides that any sums which Great Western obtains as a result of the constructive trust are to be credited against the money judgment imposed against Marilyn.

4. "No-evidence" points may be raised by (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 822 (Tex.1985).

grounds because a party is entitled to the submission of a question if there is *some evidence* to support the submission. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983) ("The factual insufficiency of the evidence to support an affirmative answer to an opponent's issue furnishes no basis for refusal to submit the issue"). Accordingly, to the extent that Marilyn bases her challenge to the submission of questions in the court's charge on factual insufficiency grounds, her second, third, fourth, fifth, sixth, seventh, and eighth issues are overruled.

### Imposition of Constructive Trust on Life Insurance Proceeds

Marilyn challenges the imposition of the constructive trust in three of her appellate issues. In her first issue, Marilyn challenges the trial court's ruling permitting Great Western's accounting expert Harold Eldridge to testify. This issue relates to the imposition of the constructive trust because a large part of Eldridge's testimony focused on tracing the funds used to pay the premiums on the life insurance policies. In her tenth issue, Marilyn challenges the factual sufficiency of the evidence supporting the jury's answers with respect to the source of the funds used to pay the premiums on four of the policies. Marilyn's ninth issue addresses the trial court's refusal to submit a question pertaining to the payment of premiums on a life insurance policy issued by Stonebridge Insurance Company.

#### Applicable Law

The Fort Worth Court of Appeals addressed a similar claim involving the payment of life insurance premiums with misappropriated funds in *Marineau v. Gen. Am. Life Ins. Co.*, 898 S.W.2d 397 (Tex. App.-Fort Worth 1995, writ denied). An agent of a life insurance company used funds that he stole from the company to purchase a life insurance policy issued by the company. *Id.* at 400. The policy named his wife as the beneficiary. *Id.* The court held that, when an insurance policy's premiums are paid with funds fraudulently obtained, the beneficiary of the policy holds the future proceeds from that policy in trust for the owner of the defrauded funds. *Id.* at 402. The holding in *Marineau* is consistent with the majority view of this area of insurance law:

> Where funds of another have been misappropriated and used to purchase, or pay premiums on, life insurance, the courts will generally allow the one whose funds were misused some form of recovery. Generally, courts will impress either a constructive or a resulting trust on the proceeds of life insurance, or a lien on the proceeds in favor of one whose money was wrongfully used to pay premiums.

Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 74:37.

In *Marineau*, the court outlined the applicable burdens of proof in a case of this type:

> A plaintiff seeking to recover embezzled funds has the initial burden to trace the embezzled funds into specific property. Once the plaintiff traces the embezzled funds into specific property, that property becomes the subject of a constructive trust. If property is purchased with funds from an account containing both embezzled funds and funds belonging to the wrongdoer, that property is the subject of the trust, unless the wrongdoer can prove that the subject property was purchased with the wrongdoer's own funds, and not embezzled funds.

898 S.W.2d at 400 (citations omitted). The culpability of the life insurance policy's beneficiary is irrelevant because the beneficiary has no greater rights in the policy's

proceeds than did the policyholder.[5] Couch, Section 74:37. As was the case in *Marineau,* Marilyn acknowledges that Alan deposited stolen funds into an account from which the life insurance policy premiums were paid. Accordingly, the burden shifted to Marilyn to prove that the premiums were paid, in whole or in part, with non-embezzled funds.

### Payment of Premiums

As noted previously, the five life insurance polices provided for total benefits of $1,225,102.50. Alan paid premiums on the five policies in the total amount of $15,163.52 from the joint account that he and Marilyn maintained at the Midland Community Federal Credit Union. The premium payments were drafted on either a monthly or quarterly basis. From June 2000 through July 2003, Alan deposited $130,085.81 in salary that he received from Great Western into the joint account. He also deposited $114,834 of funds that he stole from Great Western into the joint account during this period. The jury determined the source of the funds used to pay the premiums on four of the five policies. The jury found that all of the premiums on the four policies were paid with funds that Alan stole from Great Western. Accordingly, the trial court imposed a constructive trust on all of the funds remaining in existence from the life insurance proceeds.[6]

### Expert Testimony

Great Western offered the testimony of Eldridge, a certified public accountant, on various accounting issues. Eldridge's testimony primarily addressed the matter of tracing the source of the funds which Alan used to pay premiums on the life insurance policies. Eldridge also offered testimony that analyzed the parties' financial records from the perspective of Marilyn's knowledge of Alan's embezzlement.

■ Marilyn asserts in her first issue that the trial court erred in determining that Great Western established the reliability of Eldridge's expert testimony under the requirements of *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). The Texas Supreme Court recently addressed the *Daubert/Robinson* requirements in *Cooper Tire & Rubber Co. v. Mendez,* 800–01 (Tex. 2006). In *Cooper,* the court stated:

> Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. If the expert's scientific evidence is not reliable, it is not evidence. The trial court's determination that these requirements are met is reviewed for abuse of discretion. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion.

In deciding whether an expert is qualified, the trial court must ensure that those who purport to be experts truly have expertise concerning the actual

---

5. "A beneficiary, or any innocent taker except a bona fide purchaser, has no greater rights than the insured had in the proceeds. Therefore, a beneficiary may be held to account as a constructive trustee in the same manner and to the same extent as the insured for misappropriated funds used to pay premiums." Couch, Section 74:37.

6. Since Marilyn had the burden of proving that non-embezzled funds were used to pay the premiums on the policies, the constructive trust imposed by the trial court included the fifth policy issued by Stonebridge Insurance Company even though the jury did not determine the source of the funds that were used to pay its premiums.

subject about which they are offering an opinion. Scientific testimony is unreliable if it is not grounded in the methods and procedures of science, and amounts to no more than a subjective belief or unsupported speculation. We have also recognized that expert testimony is unreliable if there is simply too great an analytical gap between the data and the opinion proffered. We are not required ... to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect. A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious. Under that circumstance, the expert's scientific testimony is unreliable and, legally, no evidence.

In *Robinson,* we identified six factors that trial courts may consider in determining whether expert testimony is reliable:

1. the extent to which the theory has been or can be tested;

2. the extent to which the technique relies upon the subjective interpretation of the expert;

3. whether the theory has been subjected to peer review and/or publication;

4. the technique's potential rate of error;

5. whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

6. the non-judicial uses which have been made of the theory or technique.

We emphasized in *Robinson* that these factors are non-exclusive and that

[TEX.R. EVID.] 702 contemplates a flexible inquiry.

In [*Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998) ], we recognized that the *Robinson* factors cannot always be used in assessing an expert's reliability, but there must be some basis for the opinion offered to show its reliability. We further made clear in *Gammill* that the *Robinson* relevance and reliability requirements apply to all expert testimony.

The trial court is not required to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. If the expert brings only his credentials and a subjective opinion, his testimony is fundamentally unsupported and therefore of no assistance to the jury. [Rule 702], by its terms, only provides for the admission of expert testimony that actually assists the finder of fact.[7]

204 S.W.3d at 800-01 (citations and quotations omitted).

At Marilyn's request, the trial court conducted a lengthy hearing outside of the jury's presence regarding the reliability of Eldridge's proposed testimony. Marilyn primarily directed her challenge to the tracing method that Eldridge used in tracing the source of funds that Alan used in paying the premiums on the life insurance policies. Eldridge testified about the accounting standards and publications upon which he relied to select the tracing method that he used. He also used an article written by an attorney which addressed the characterization and tracing of marital property in Texas. Eldridge testified that there were no accounting rules directly related to the tracing and apportionment

---

**7.** TEX.R. EVID. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

of assets purchased with embezzled funds that have been commingled with other funds.

Eldridge concluded that the "family expense method" was the most equitable method for determining the source of the funds used to pay the premiums. As applied by Eldridge, the family expense method is a theoretical approach to tracing. It is based on the premise that Alan's salary was used first for the payment of the family's living expenses prior to paying for any other expenses. As noted previously, Alan deposited $130,085.81 of his salary into the joint account from June 2000 through July 2003.[8] Eldridge determined that $223,188.26 in family expenses were paid from the joint account during this period.[9] Since the family's living expenses exceeded Alan's salary, Eldridge concluded that the embezzled funds which Alan deposited into the joint account constituted the source of the funds for all other expenditures from the account, including the payment of the life insurance proceeds.

Marilyn asserts that the family expense method is an invalid method for tracing deposits and withdrawals from a bank account because it has not been used by Texas courts in the marital property context. In advancing this argument, Marilyn equates Alan's salary with community property and the stolen funds with separate property. Relying on family law cases, she argues that the "community out first" presumption should be applied to this situation. *See Welder v. Welder,* 794 S.W.2d 420, 433 (Tex.App.-Corpus Christi 1990, no writ) (When separate property and community property are commingled in a single bank account, we presume that

the community funds are drawn out first before separate funds are withdrawn).

We disagree with Marilyn's argument that the principles of tracing which have been applied in the marital property context are applicable to the tracing of embezzled funds that have been commingled with other funds. The motives of an embezzler are likely quite different than those of a spouse in the possession of both separate and community funds. Section 211 of the Restatement of Restitution recognizes this distinction. RESTATEMENT (FIRST) OF RESTITUTION § 211 (1937). Section 211(1) provides: "Where a person wrongfully mingles money of another with money of his own and subsequently makes withdrawals from the mingled fund, the other is entitled to an equitable lien upon the part which remains and the part which is withdrawn or upon their product." The comment to Subsection (1) states:

It is immaterial in what order the deposits were made, whether the money of the claimant was first deposited or the wrongdoer's individual money. There is no inference that the money first deposited is the money first withdrawn. The rule ... that withdrawals are presumed to be in the same order as that in which the deposits were made, has no application to this situation where a deposit is made by a wrongdoer. That rule is applicable only to situations where the intention of the depositor is controlling.

So also, there is no inference that the wrongdoer withdraws his own funds first, nor is there an inference that he withdraws the claimant's funds first.... When he withdraws a part, he withdraws funds on which the claimant has a

---

**8.** The joint account had a balance of only $944.04 on June 1, 2000.

**9.** Eldridge did not include the payment of life insurance premiums as a family expense.

lien, and he leaves a balance on which the claimant also has a lien.

Thus, the Restatement rejects an application of the "community out first" presumption in this case.

Eldridge testified that there are multiple methods that could be used to trace the funds that Alan used to pay the insurance premiums.[10] He utilized the family expense method because he believed it was the most equitable. When one considers the fact that Alan's family expenses greatly exceeded his salary, the application of the family expense method is reasonable. Furthermore, the family expense method does not contradict the view expressed in the Restatement because it does not depend upon an analysis of the sequence in which deposits and withdrawals were made. Accordingly, we conclude that Eldridge's reliance on the family expense method was not improper.

Marilyn argues that Eldridge misapplied the family expense method because he did not include the insurance premiums as a family expense. She bases this argument on the fact the family district court in Midland classifies the payment of life insurance premiums as a "monthly expense" on its "Financial Information Statement" that spouses fill out in divorce proceedings. We reject Marilyn's argument that the financial information statement is controlling on this issue. The purpose of that statement is to provide the trial court with information about the spouses' finances at the outset of the divorce. It is not applicable to a situation where one is attempting to trace the source of payments in the case of commingled, embezzled funds.

We conclude that the trial court did not abuse its discretion by overruling Mari-

lyn's challenge to Eldridge's testimony under *Daubert* and *Robinson*. Eldridge offered extensive testimony regarding the accounting methods that he used in forming his opinions and the basis for these opinions. The record does not reflect that the trial court acted without reference to guiding rules or principles in permitting Eldridge to testify. We note in this regard that the testimony of a CPA regarding the analysis of financial records does not seem to be the type of expert testimony which the six factors outlined in *Robinson* would be particularly helpful in assisting the trial court to determine the reliability of the expert's proposed testimony. Instead, the "general reliability" test set out in *Gammill* would appear to be more appropriate. 972 S.W.2d at 726. Marilyn's first issue is overruled.

*Source of Funds Used to Pay Insurance Premiums*

■ As noted previously, the jury determined that all of the premiums for four of the policies were paid with funds that Alan stole from Great Western. Marilyn attacks the factual sufficiency of the evidence supporting the jury's answers in her tenth issue. A party attacking the factual sufficiency of an adverse finding on an issue on which it has the burden of proof must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001).

Marilyn premises her tenth issue in part on her first issue where she alleges that the trial court erred in permitting Eldridge to offer his opinion on tracing. She contends that Eldridge's testimony should be ignored because the trial court should not have permitted him to testify. She

---

**10.** The accounting expert in *Marineau* also testified that there were several possible methods for tracing insurance premiums paid in part with misappropriated funds. 898 S.W.2d at 403.

further argues that, in the "absence" of Eldridge's testimony, the only credible evidence on the issue of tracing was offered by her accounting expert Ken Huff. Huff conducted a line-item analysis of the joint account's deposits and withdrawals to determine the source of funds for each insurance premium payment. Based upon his calculations, he apportioned $761,830 of the insurance proceeds to Marilyn and $363,266 to Great Western.

We disagree with Marilyn's contention that the jury's apportionment was against the great weight and preponderance of the evidence. We have determined that the trial court did not err in permitting Eldridge to testify and that Eldridge's method of tracing was not improper. Thus, there was evidence which supported the jury's answers. Marilyn's evidence to the contrary was not so overwhelming as to render the jury's verdict manifestly unjust. Huff's method of analysis required mathematical accuracy on his part in the sequencing of the joint account's deposits and withdrawals. Huff acknowledged on cross-examination that there were instances in his calculations where the computer program that he used did not sort the deposits and withdrawals in the correct order. Moreover, Huff's method of tracking conflicts with the Restatement because his calculations depended on the sequencing of deposits and withdrawals. Marilyn's tenth issue is overruled.

*Omitted Policy*

█ Marilyn argues in her ninth issue that the trial court erred in refusing to submit an apportionment question in the court's charge regarding the Stonebridge policy. The standard for review of an allegation of jury charge error is an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). We indulge all inferences in favor of the submission. *Kindred,* 650 S.W.2d at 63.

In determining whether a trial court should have submitted a question to the jury, the reviewing court must examine the record for evidence supporting submission and ignore all evidence to the contrary. *Elbaor,* 845 S.W.2d at 243.

Great Western objected to Marilyn's attempt to offer Huff's opinion about the Stonebridge policy on the ground that Marilyn did not timely provide the opinion during discovery. In response to the objection, the trial court instructed Marilyn's counsel as follows: "[D]on't go into an opinion on Stonebridge until we resolve this issue." It does not appear that the trial court revisited the issue of the Stonebridge policy until Great Western sought a partial directed verdict on the Stonebridge policy after the close of evidence. In denying Great Western's request, the trial court stated: "I believe there's underlying evidence in the record that could support [it]." However, the trial court subsequently denied Marilyn's request for an apportionment question on the Stonebridge policy.

Marilyn contends that there was evidence regarding the payment of the Stonebridge policy in a 107-page section of Huff's report detailing each one of the 3,921 transactions occurring with the joint account from January 2000 until July 2003. While Huff's raw data includes the eleven payments of premiums on the Stonebridge policy, he did not highlight these payments in green ink like he did the payments on the other policies. Furthermore, Huff did not include a summary for the payment of premiums on the Stonebridge policy as he did with the other four policies. In light of these omissions in Huff's written report and the trial court's ruling forbidding Marilyn from introducing evidence about the Stonebridge policy, we conclude that the trial court did not abuse its discretion in refusing to submit an apportionment ques-

tion for the Stonebridge policy. Marilyn's ninth issue is overruled.

## Civil Conspiracy

 Marilyn's second, third, fourth, fifth, and sixth issues address the conspiracy causes of action. An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). The essential elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996); *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995). It is not the agreement itself but an injury to the plaintiff resulting from an act done pursuant to the common purpose that gives rise to a cause of action for civil conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex.1979). In other words, recovery is not based on the conspiracy but on an underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Thus, a conspiracy claim is a derivative tort. *Id.* Great Western alleged breach of fiduciary duty and fraud causes of action as underlying torts to support its conspiracy claims against Marilyn. The torts of fraud and breach of fiduciary duty have been recognized as causes of action that will support a civil conspiracy claim. *See Lesikar v. Rappeport*, 33 S.W.3d 282, 302 (Tex.App.-Texarkana 2000, pet. denied).

## Breach of Fiduciary Duty

 Marilyn asserts in her fourth issue that the trial court erred in submitting a question in the court's charge that asked if a fiduciary relationship existed between Alan and Great Western.[11] She initially argues that the issue of whether Alan owed a fiduciary duty to Great Western is a question of law. We disagree. In certain formal relationships, such as an attorney-client or trustee relationship, a fiduciary duty arises as a matter of law. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex.2002). Texas courts have also recognized that certain informal relationships may give rise to a fiduciary duty. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex.1992). The existence of an informal, confidential relationship is usually a question of fact. *Id.* Since Alan did not have a formal relationship with Great Western that has been recognized as giving rise to a fiduciary duty as a matter of law, the issue of whether he had a confidential relationship with Great Western was a question of fact.

 Marilyn also asserts in her fourth issue that there was no evidence to support the submission of a question that asked if a fiduciary relationship existed between Alan and Great Western. She begins her evidentiary analysis by discussing evidence which was contrary to a finding that Alan owed a fiduciary duty to Great Western. We must disregard this evidence, however, because we must limit our review of the record to only the evidence supporting the claim that Alan had a

---

**11.** The question read as follows:
 Did a relationship of trust and confidence exist between Alan Paschal and Great Western?
 Instruction: You are instructed that a relationship of trust and confidence, commonly referred to as a "fiduciary relationship" existed if Great Western justifiably placed trust and confidence in Alan Paschal to act in Great Western's best interest.

fiduciary relationship with Great Western. *Elbaor*, 845 S.W.2d at 243.

Alan worked as a senior revenue accountant for Great Western. He was in charge of disbursing revenue received by Great Western to the various working interest and royalty interest owners who owned interests in the leases that Great Western operated. Alan performed this task by periodically setting up the list of payees and their respective payment amounts in Great Western's computer system. He subsequently printed out the checks to be issued by Great Western and forwarded them to someone else for mailing to the appropriate payees. No other official at Great Western examined the checks that Alan printed out prior to their delivery to the payees.[12]

 The term "fiduciary" generally applies "to any person who occupies a position of peculiar confidence towards another." *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 512 (1942). The responsibilities that Great Western assigned to Alan to distribute millions of dollars of revenue to the appropriate recipient is some evidence that he occupied a position of peculiar confidence toward Great Western and owed Great Western a fiduciary duty. Accordingly, the trial court did not abuse its discretion in submitting a question to the jury regarding Alan's status as a fiduciary. Marilyn's fourth issue is overruled.

 In her fifth issue, Marilyn contends that the trial court erred in submitting a question in the court's charge regarding the damages caused by Alan's breach of fiduciary duty.[13] She argues that the trial court abused its discretion by submitting this issue because it required the jury to assess damages based upon the conduct of a non-party. We disagree. While neither Alan nor his estate was a party before the trial court, Great Western alleged that Alan and Marilyn were a part of a conspiracy that harmed Great Western. Once a conspiracy is proven, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Carroll*, 592 S.W.2d at 926. Since the charge conditioned the jury's consideration of the damage question on an affirmative finding that Marilyn was part of a conspiracy that damaged Great Western, the trial court did not err in submitting a damage question regarding the damages caused to Great Western by Alan's breach of fiduciary duty.[14] Marilyn's fifth issue is overruled.

*Fraud*

Marilyn's third and sixth issues relate to the fraud cause of action. She alleges in her sixth issue that the trial court erred in submitting a question which asked the jury if Alan committed fraud against Great Western because there was no evidence to justify submitting this issue to the jury. In her third issue, Marilyn argues that there was no evidence to support the submission of a question that asked the jury to determine Great Western's damages caused by her fraud. She additionally argues in her third issue that the fraud damage question was not supported by

---

**12.** The checks were not signed by an actual person because the signature of Great Western's president was pre-printed on the checks.

**13.** The question read as follows:
What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Great Western for its damages, if any, that were proximately caused by Alan Paschal's breach of fiduciary duty?

**14.** Marilyn challenges the submission of questions regarding her liability as a conspirator. We address this challenge in a subsequent portion of the opinion.

proper pleadings and that the manner in which the question was worded constituted an improper comment on the weight of the evidence. As noted previously, the trial court did not award any damages to Great Western on the fraud claim because the damages awarded for the breach of fiduciary duty claim were greater.[15] Accordingly, we do not consider Marilyn's third and sixth issues because they are not necessary to the final disposition of the appeal. TEX.R.APP. P. 47.1.

*Submission of Conspiracy Liability Questions*

Marilyn asserts in her second issue that the trial court erred in submitting three questions in the court's charge which asked if she was part of a conspiracy that damaged Great Western.[16] She first contends that Great Western did not have sufficient pleadings to support their submission. Secondly, Marilyn challenges the legal sufficiency of the evidence supporting the submission of these questions.

■■■ While Marilyn alleges a pleading deficiency in stating her second issue, she does not present any argument or cite any authority in support of this contention in her brief as required by TEX.R.APP. P. 38.1(h). Accordingly, Marilyn has waived this issue for appellate consideration. We note in this regard that Great Western's pleadings contained extensive allegations regarding its attempt to impose liability against Marilyn for civil conspiracy.

■■■ Marilyn focuses her legal insufficiency contention on the "meeting of the minds" element of a conspiracy cause of action. She cites the various places in the record where she denied having any knowledge that Alan was stealing money from Great Western. While Marilyn acknowledged that she was aware that Alan had made large purchases of jewelry, she denied knowing the source of the funds for these purchases. She also emphasizes that she had no knowledge of or participation in the manner in which Alan carried out the theft of funds from Great Western.

Marilyn argues that the holding in *Schlumberger Well Surveying Corp. v.*

15. See Footnote No. Two.

16. Specifically, Marilyn challenges the submission of Questions Nos. Three, Eight, and Ten in the court's charge. Questions Nos. Three and Eight were identical. They asked the jury as follows:

Was Marilyn Paschal part of a conspiracy that damaged Great Western?
Instruction: To be part of a conspiracy, Marilyn Paschal and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Great Western. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Question No. Three followed the question that asked the jury if Alan breached a fiduciary duty owed to Great Western. Question No. Eight followed the question that asked if Alan committed fraud against Great Western. Since the trial court did not award any damages to Great Western on the fraud claim, we do not consider her challenge to Question No. Eight. Rule 47.1.

Question No. Ten was conditioned on an affirmative answer to Question No. Eight. It asked the jury to determine if it found by clear and convincing evidence that Great Western suffered harm from the conspiracy to commit fraud. Thus, Question No. Ten served the purpose of possibly enabling Great Western to obtain a recovery of exemplary damages based on the fraud/conspiracy cause of action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.003 (Vernon Supp.2006). The jury answered Question No. Ten in the affirmative. However, the jury subsequently did not award Great Western any exemplary damages. Since the jury's affirmative answer to Question No. Ten did not support an award of any additional damages against Marilyn, we do not consider her challenge to its submission. Rule 47.1.

*Nortex Oil & Gas Corp.*, 435 S.W.2d 854 (Tex.1968), is controlling in this case. *Schlumberger* involved "slant hole" oil wells that were bottomed beyond lease lines such that they were illegally producing oil from neighboring leases. 435 S.W.2d at 855. As a well servicing company that worked on the wells drilled by others, Schlumberger had knowledge that the wells in question deviated from a normal vertical course. *Id.* at 856. Furthermore, Schlumberger took steps to protect its customers who might be subjected to investigation for drilling illegally deviated wells. *Id.*

The subsequent purchaser of the wells in question alleged that Schlumberger conspired with the sellers of the wells to commit fraud based upon Schlumberger's knowledge that the wells were slant hole wells. *Id.* at 855–56. The Texas Supreme Court determined that there was no evidence to support a conspiracy finding because there was no basis upon which one could reasonably infer that Schlumberger had knowledge of the object of the conspiracy or an intention to injure adjoining owners. As stated by the court:

> For purposes of this opinion, we may assume that Schlumberger had good reason to believe that the conspiracy existed as alleged by Nortex, and that the existence and object of the conspiracy could have been discovered by Schlumberger by the exercise of the slightest degree of diligence. We are unwilling to say, however, that the evidence will support a reasonable inference that Schlumberger had actual knowledge that the four particular wells had been or were to be bottomed under adjoining or adjacent leases for the purpose of producing oil owned by others, or that Schlumberger intended to participate in any such wrong.

*Id.* at 857. Marilyn cites *Schlumberger* for the proposition that evidence that she may have had "good reason to believe" that Alan stole funds from Great Western is insufficient to support the submission of a conspiracy issue to the jury.

As noted by the court in *Schlumberger*, proof of a conspiracy must usually be made by circumstantial evidence. *Id.* at 858. The court addressed this subject in the early case of *Jernigan v. Wainer*, 12 Tex. 189, 193 (1854), wherein the court stated:

> When men enter into conspiracies, they are not likely to call in a witness. They resolve their schemes clandestinely and in secret. Their purpose is imposition and deception; and secrecy is necessary to its accomplishment. In such cases the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses.

The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963). It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a given time prior to each transaction. *Id.* at 582. Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions. *Id.*

There is abundant evidence that Marilyn enjoyed the fruits of Alan's theft. For example, the couple purchased $116,637.90 in ladies' jewelry from a single jewelry store between July 2000 and June 2003. During the first half of 2003, the couple purchased mail order items from an entity called "Shop NBC" in the amount of $91,870.93.

At the time these purchases were made, the couple only reported annual gross wages of approximately $50,000 on their joint tax returns.[17] After deducting losses from their horse operation, the couple reported adjusted gross income of $37,920, $40,516, and $36,947 for 2000, 2001, and 2002. Eldridge testified that the income listed on the couples' tax returns would have only provided them with disposable income of approximately $12,000 a year during this period after deducting medical expenses, home expenses, and charitable contributions. Eldridge concluded that "Marilyn Paschal had knowledge that Alan Paschal was obtaining substantial funds from some source that could have likely only come from his embezzlement."

Alan and Marilyn executed a document entitled "Marital Contract" on June 30, 2000. The document provided as follows:

### MARITAL CONTRACT

WHEREAS, ALAN PASCHAL and MARILYN PASCHAL desire to enter into written agreement, respecting certain obligations financially for themselves;

WHEREAS, by such contractual arrangements, it is expected that they will minimize and curtail disputes or disagreements respecting such obligation, in order to have a more harmonious relationship;

NOW, THEREFORE in consideration of the above-described premises, ALAN PASCHAL and MARILYN PASCHAL do hereby agree as follows:

As an incentive to be faithful and not to mentally or physically abuse MARILYN PASCHAL, ALAN PASCHAL will meet the following financial obligations, even though the parties may terminate their marital relationship by divorce:

(1) ALAN PASCHAL will pay the mortgage payments on the family house which they occupy as the marital homeplace, including any ad valorem, insurance and other charges for the maintenance and preservation of such home, including but not limited to the insurance, whether the same be as a direct payment, or as an additional amount paid into escrow, along with the monthly payment of principal and interest;

(2) ALAN PASCHAL will pay for the feed and other reasonable maintenance necessary for the animals maintained at the homeplace;

(3) ALAN PASCHAL will maintain a life insurance policy in the amount of at least $1,000,000.00 with MARILYN PASCHAL as the beneficiary.

(4) ALAN PASCHAL will also give MARILYN PASCHAL the sum of $500.00 a month in addition to the other payments called for in this contract and shall pay all medical expenses for MARILYN PASCHAL as such medical expenses become necessary to properly care for her health and welfare.

(5) ALAN PASCHAL will pay for all reasonable expenses and mainte-

---

**17.** Marilyn did not work outside of the home. She testified that she believed Alan made a salary of $70,000 a year.

nance necessary to maintain the residence in Item No. 1.

(6) ALAN PASCHAL will pay all current credit card debts owed by the parties or either of them.

Marilyn testified that the purpose of this document was to protect her and her family financially. She testified that Alan had been involved in several automobile accidents and that she was worried that he would be unable to work in the future. Marilyn also testified she planned to try to get pregnant by in vitro fertilization. When asked what she was required to do under the contract, Marilyn replied: "I wasn't required to do anything except, the way the doctors put it, risk my life to become pregnant." Marilyn also testified that the marital contract was inspired by her discovery in April 1999 that Alan had been unfaithful to her.

The execution of this marital contract in June 2000 coincided with Alan's first payment of a premium on the first life insurance policy that he purchased. It also coincided with the first purchase of jewelry in July 2000. Additionally, the amount of money which Alan stole from Great Western increased significantly after the execution of the document. In the 102–month period from January 1992 through June 2000, Alan stole $490,784.90 from Great Western for a monthly average of $4,811.60.[18] In the 36–month period from July 2000 through June 2003, Alan stole $990,079.06 from Great Western for a monthly average of $27,502.20.

The circumstances in this case are substantially different from the circumstances in *Schlumberger*. The alleged conspirators in *Schlumberger* were independent entities who presumably were dealing with each other in arms-length transactions entered into for the parties' mutual benefit. The alleged conspirators in this case were husband and wife. Furthermore, there was no evidence in *Schlumberger* that the target defendant received any ill-gotten gains as a result of the alleged conspiracy. 435 S.W.2d at 857. As noted previously, Marilyn obviously enjoyed the fruits of Alan's theft.

We conclude that there was evidence which supports an inference that Marilyn had actual knowledge that Alan was stealing large sums of money from Great Western. Alan injected several thousands of dollars a month into the family's finances which greatly exceeded the amount of the wages which he and Marilyn reported to the IRS. The large amount of money that Alan embezzled, coupled with the absence of any other possible source for this windfall, is evidence which supports an inference that Marilyn had actual knowledge that Alan embezzled the funds from his employer in his role as a revenue accountant for Great Western. The unusual circumstances surrounding the marital contract that Alan and Marilyn executed strengthens the inference of concerted action on their part. Marilyn's second issue is overruled.

### Conversion

■ Marilyn asserts in her seventh issue that the trial court erred in submitting questions to the jury on Great Western's conversion claim. The jury found that she converted life insurance proceeds paid by Cuna Mutual Life Insurance Company, Stonebridge Life Insurance Company, and U.S. Financial Life Insurance Company in the amount of $775,096. Attorney Bill

---

18. Alan began stealing money from Great Western in 1991. He stole a total of $11,516.62 from Great Western in 1991 in four transactions scattered throughout the year. From 1992 to 2000, he diverted funds on a monthly basis. Beginning in November 2000, Alan diverted funds at least twice a month.

Bowden assisted Marilyn in obtaining payment of these insurance proceeds soon after Alan's death. Bowden delivered a check to Marilyn on September 16, 2003, in the amount of $732,614.15. She immediately paid $250,000 of this amount to trial counsel to represent her in the lawsuit. On September 24 and 26, 2003, she spent $450,000 to purchase two annuities from General Electric Capital Assurance Company.

■ A conversion occurs when one person makes an unauthorized, wrongful assumption and exercises dominion and control over the personal property of another to the exclusion of or inconsistent with the owner's rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex.1971). Marilyn asserts that the evidence did not support a claim for conversion. She first argues that the proceeds of life insurance policies are not capable of being converted. Marilyn also contends that, since she was the named beneficiary of the policies, Great Western did not have a superior right in the policies' proceeds which would support a claim for conversion.

■ Money is subject to conversion only when it can be identified as a specific chattel and not where an indebtedness may be discharged by the payment of money generally. *See Newsome v. Charter Bank Colonial,* 940 S.W.2d 157, 161 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *Estate of Townes v. Townes,* 867 S.W.2d 414, 419 (Tex.App.-Houston [14th Dist.] 1993, writ denied). An action for conversion of money will only lie where the money is (1) delivered for safekeeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by its keeper. *Newsome,* 940 S.W.2d at 161. In addressing another issue, the court in *Marineau*

stated: "The right to receive insurance proceeds payable at a future but uncertain date is 'property.' Such property is said to be in the nature of a chose in action which matures at the death of the insured." 898 S.W.2d at 402. The critical inquiry in this case is whether the maturation of the policies that occurs when the insured dies transforms the policies' proceeds into an indebtedness that may be discharged by the payment of money.

Under the facts of this case, we conclude that the policy proceeds remained property subject to conversion. The jury determined that the beneficiary of the life insurance policies conspired with the insured to wrongfully obtain the funds used to pay all of the premiums on the life insurance policies. Furthermore, the policies were purchased pursuant to the terms of a contract between the insured and the beneficiary. Marilyn was required to hold the policies and their proceeds in trust for the benefit of Great Western. *Id.* at 402–03. Marilyn wrongfully exercised dominion and control over the proceeds when she used the funds for her own benefit rather than preserving them for Great Western. To hold otherwise would permit a coconspirator to profit from her wrongdoing.

■ Marilyn also contends that there was no evidence to support a recovery because there was no evidence that Great Western suffered a loss from her acts. A plaintiff must prove damages before recovery is allowed for conversion. *United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147 (Tex.1997). Generally, the measure of damages for conversion is the fair market value of the property at the time and place of conversion. *Id.* Great Western suffered a loss from Marilyn's conversion of the policy proceeds because she withheld them for her own use rather than delivering them to Great Western.

■ Lastly, Marilyn argues that there was no evidence that Great Western made a demand for the policy proceeds which she refused. "Demand" and "refusal" are sometimes listed as elements in a conversion claim. *See Apple Imps., Inc. v. Koole,* 945 S.W.2d 895, 899 (Tex.App.-Austin 1997, writ denied). These elements are particularly important when the conversion claim arises from a bailment relationship. *See Presley v. Cooper,* 155 Tex. 168, 284 S.W.2d 138, 141 (1955). The demand and refusal elements of conversion are not required if other evidence establishes an act of conversion. *Id.* These elements are not applicable in this case because Marilyn's disposition of the policy proceeds to the exclusion of Great Western's rights in them established an act of conversion. Marilyn's seventh issue is overruled.

### Submission of Damage Questions

In her eighth issue, Marilyn asserts that the trial court erred in submitting three damage questions in the court's charge. These questions included the damage questions for the breach of fiduciary duty claim, the fraud claim, and the conversion claim. She contends that there was no evidence to support an award of damages on these claims.[19] As previously noted, the trial court did not base an award of damages to Great Western on the fraud cause of action. Accordingly, we do not address Marilyn's challenge to the submission of the damage question on the fraud cause of action. Rule 47.1.

■ Marilyn premises her no evidence claim on the contention that Eldridge's testimony was the only evidence that supported these damage awards and that his testimony in these areas was unreliable. We have previously determined that the trial court did not err in overruling Marilyn's objection to the reliability of Eldridge's testimony. With respect to the jury's damage award on the breach of fiduciary duty claim, the evidence is undisputed that Alan stole at least $1,492,380.58 from Great Western. It is well-settled law that, upon joining a conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy. *State v. Standard Oil Co.,* 130 Tex. 313, 107 S.W.2d 550, 560 (1937). Accordingly, the extent that Alan may have stolen some of these funds prior to Marilyn's participation in the conspiracy is irrelevant because she became liable for his previous acts when she joined the conspiracy. Additionally, the amount of policy proceeds she obtained after Alan's death was also undisputed. Marilyn's eighth issue is overruled.

### This Court's Ruling

The judgment of the trial court is affirmed in all respects.

McCLOUD, S.J., not participating.[20]

---

19. Marilyn also attempts to rely upon a claim of factual insufficiency to attack the submission of these damage questions in the court's charge. We have overruled this claim in the previous section of this opinion labeled "Preliminary Procedural Matter."

20. Austin McCloud, Retired Chief Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.