# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 1, 2008

Charles R. Fulbruge III
Clerk

No. 06-10874

_____

IN THE MATTER OF MICHAEL MCLAIN

_____

MICHAEL MCLAIN; LORI FUENTES; GIL MCLAIN, JR.

                                            Appellees

v.

ROBERT NEWHOUSE, as Trustee for the Bankruptcy Estate of Michael
McLain

                                            Appellant

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before DEMOSS, DENNIS, and OWEN, Circuit Judges.

DENNIS, Circuit Judge:

This bankruptcy appeal raises the novel issue of whether the use of undisclosed, pre-petition bankruptcy funds to make the first premium payment on a term life insurance policy renders all or some of the policy proceeds part of the bankruptcy estate. The bankruptcy court held that the use of such funds in this case does not render the policy proceeds part of the bankruptcy estate. On appeal the district court did not address this issue. Instead, the district court held that the bankruptcy trustee failed to set forth any authenticated evidence establishing the existence of undisclosed, pre-petition bankruptcy funds in this

case. Thus, the district court affirmed the decision of the bankruptcy court, albeit on other grounds. For the reasons stated herein, we reverse the decisions of the district and bankruptcy courts and remand this matter for proceedings consistent with this opinion.

## I. BACKGROUND

The appellant in this case is Robert Newhouse, Trustee for the Bankruptcy Estate of Michael McLain ("Newhouse"). The Appellees are Michael McLain, the Debtor ("McLain"), and his siblings, Lori Fuentes and Gil McLain, Jr.

From January 1, 2001 through April 15, 2002, Brandi McLain, the wife of Michael McLain, received her paychecks by direct deposit from her employer. Sometime between April 15, 2002 and May 1, 2002, the McLains cancelled direct deposit, began closing their bank accounts, and decided to operate solely on a cash basis for the admitted purpose of concealing their cash in anticipation of filing for bankruptcy. To that end, from April 25, 2002 through April 29, 2002, they withdrew by ATM the sum of $885 from their checking account and closed the account. On May 1, 2002, according to Newhouse, Brandi McLain received a paycheck in the amount of $1,640. Thus, as of May 1, 2002, according to Newhouse, the McLains had approximately $2,525 ($1640 + $885) cash on hand, which was not disclosed on their sworn schedules when they filed for Chapter 7 bankruptcy two days later on May 3, 2002. McLain disputes this factual scenario. According to him, there is no evidence that his wife received a paycheck on May 1, 2002. Moreover, according to him, he paid his bankruptcy attorney $1,100 in cash on April 29, 2002 as compensation for filing and handling the bankruptcy petition. Accordingly, McLain maintains, there was no meaningful cash on hand at the time the bankruptcy petition was filed and thus, nothing to disclose.

On May 7, 2002, McLain's father, Gill McLain, Sr., applied for a $1.2 million life insurance policy (the "Policy") naming his son, McLain, as the sole

owner and beneficiary. On June 11, 2002, West Coast Life Insurance ("WCL") issued the Policy. On June 14, 2002, the McLains appeared at their creditors' meeting but did not disclose that McLain was now the owner and beneficiary of a term life insurance policy. On July 11, 2002, McLain paid the first premium payment on the Policy in the amount of $1,774.97 via two money orders. On August 26, 2002, the McLains were discharged from bankruptcy. McLain continued to make four post-discharge quarterly premium payments on the Policy, each in the amount of $1,774.97. On July 29, 2003, the death benefit became immediately payable upon the shooting death of his father. McLain was a suspect in his father's death and thus, WCL and McLain's siblings challenged his entitlement to the proceeds under the Texas Slayer Statute. See Tex. Prob. Code § 41(d); Tex. Ins. Code § 1103.152(c).[1] On January 8, 2004, WCL filed a complaint asking the district court to accept the Policy proceeds on its behalf and release it from the underlying case. The litigation between McLain and his siblings eventually settled, the terms of which are confidential.

On December 27, 2004, Newhouse filed a motion to reopen the McLains' bankruptcy case, which was officially reopened on January 25, 2005. At issue was whether McLain's alleged use of undisclosed pre-petition cash, i.e., funds

---

[1] Tex. Prob. Code § 41(d) provides:

No conviction shall work corruption of blood or forfeiture of estate, except in the case of a beneficiary in a life insurance policy or contract who is convicted and sentenced as a principal or accomplice in wilfully bringing about the death of the insured, in which case the proceeds of such insurance policy or contract shall be paid as provided in the Insurance Code of this State, as same now exists or is hereafter amended; nor shall there be any forfeiture by reason of death by casualty; and the estates of those who destroy their own lives shall descend or vest as in the case of natural death.

Tex. Ins. Code § 1103.152(c) provides:

If there is not a contingent beneficiary entitled to receive the proceeds of a life insurance policy or contract under Subsection (a), the nearest relative of the insured is entitled to receive those proceeds.

that belong to the bankruptcy estate, to make the first premium payment on the Policy renders the Policy proceeds part of the bankruptcy estate. On November 7, 2005, McLain filed a motion for summary judgment, to dismiss, to close the bankruptcy case, and for the distribution of funds held by the clerk of court. In his motion, McLain argued that the first premium payment of the Policy was made solely with post-petition cash from his wife's paychecks, i.e., funds that did not belong to the bankruptcy estate. On December 5, 2005, the bankruptcy court granted summary judgment in McLain's favor. The bankruptcy court agreed that there was an issue of material fact as to whether McLain used undisclosed pre-petition cash to make the first premium payment on the Policy. Nonetheless, the bankruptcy court held that the use of such funds did not, as a matter of law, render the Policy proceeds part of the bankruptcy estate. On December 5, 2005, Newhouse filed a timely notice of appeal to the district court.

On July 11, 2006, the district court affirmed the decision of the bankruptcy court, albeit on other grounds. The district court reasoned that Newhouse failed to raise a genuine issue of material fact as to whether McLain used undisclosed pre-petition funds to make the first premium payment on the Policy. Specifically, the district court held that Newhouse failed to set forth any authenticated evidence that the McLains had any meaningful cash on hand as of the petition date. According to the district court, the only piece of evidence to support the fact that the McLains had any meaningful cash as of that date, a disputed ledger sheet that purports to detail various financial transactions by the McLains during the months of May, June, and July of 2002, was never authenticated as a complete financial record for these months and thus, inadmissible. Thus, the district court never addressed the legal issue of whether the use of undisclosed pre-petition funds to make the first premium payment on a life insurance policy renders the policy proceeds part of the bankruptcy estate. Newhouse filed this timely notice of appeal.

## II. LEGAL STANDARD

We review the bankruptcy court's decision under the same standards as the district court: conclusions of law and mixed law and fact questions are reviewed de novo, while findings of fact are reviewed for clear error. See Plunk v. Yaquinto (In re Plunk), 481 F.3d 302, 305 (5th Cir. 2007); EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.), 430 F.3d 260, 265 (5th Cir. 2005). A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. See Hockman v. Westward Commc'ns, L.L.C., 407 F.3d 317, 325 (5th Cir. 2004). In reviewing the evidence, the court must therefore "refrain from making credibility determinations or weighing the evidence." Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007).

## III. ANALYSIS

### A. Evidentiary Issue

The district court concluded that Newhouse failed to raise an issue of material fact as to whether the McLains had any meaningful cash on hand as of the petition date. In doing so, the district court held that the only piece of evidence supporting Newhouse's argument, a ledger sheet, was unauthenticated and thus, inadmissible. The district court agreed that there was an issue of material fact as to whether Brandi McLain received a paycheck on May 1, 2002, two days before the McLains filed bankruptcy. Nonetheless, McLain continues to maintain that there is no evidence that his wife received a paycheck on May 1, 2002. The evidence, however, when construed in a light most favorable to Newhouse suggests otherwise. First, it is undisputed that Brandi McLain was

paid on a semi-monthly basis and according to a spreadsheet prepared by McLain himself, she was usually paid on the first and fifteenth of each month.[2] Moreover, McLain specifically testified that his wife received three paychecks in May of 2002. According to the spreadsheet, whenever Brandi McLain received three paychecks in a single month, she always received the first paycheck on the first day of the month.[3] In fact, over the course of two years, she almost always received a paycheck on either the first day of the month or the day before. Given this evidence, a reasonable jury could easily infer that Brandi McLain received a paycheck on May 1, 2002, especially in the absence of any evidence to the contrary. Thus, a reasonable jury could easily infer that the McLains had at least $1640 cash on hand as of May 1, 2002.[4]

Nonetheless, the district court concluded that because Newhouse failed to provide any evidence of the McLains' complete financial record between May 1, 2001 and the petition date, May 3, 2002, Newhouse failed to raise an issue of material fact as to whether the McLains had any meaningful cash on hand as of the petition date. In response, Newhouse points to a ledger sheet that was originally attached to McLain's motion for summary judgment in the bankruptcy court. The sole issue with respect to the ledger sheet is whether it is authenticated. Rule 901(a) of the Federal Rules of Evidence provides that "the requirement of authentication or identification as a condition precedent is

---

[2] For example, Brandi McLain received paychecks on 1/1/01, 1/15/01, 2/1/01, 2/15/01, 2/28/01, 3/15/01, 3/31/01, 4/15/01, 4/30/01, 5/1/01, 5/15/01, 5/31/01, 6/15/01, 6/30/01, 7/15/01, 8/1/01, 8/15/01, 9/1/01, 9/15/01, 10/1/01, 10/15/01, 11/1/01, 11/15/01, 12/1/01, 12/15/01, 1/1/02, 1/15/02, 2/1/02, 2/15/02, 3/1/02, 3/15/02, 4/1/02, 4/15/02, 6/17/02, 6/28/02, 7/15/02, 7/30/02, 8/15/02, 8/31/02, 9/14/02, 9/30/02, 10/14/02, 11/1/02, 11/15/02, 11/30/02, and 12/13/02.

[3] For example, Brandi McLain received paychecks on 2/1/01 - 2/15/01 - 2/28/01; 5/1/01 - 5/15/01 - 5/31/01; and 11/1/02 - 11/15/02 - 11/30/02.

[4] To support his argument that he had no meaningful cash on hand as of May 1, 2002, McLain notes that he paid his bankruptcy attorney $1,100 in cash. However, he did so on April 29, 2002, two days before Brandi McLain received her paycheck. Thus, the $1,100 used to pay his bankruptcy attorney could not have come from the alleged May 1, 2002 paycheck.

satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A proponent "may authenticate a document with circumstantial evidence, 'including the document's own distinctive characteristics and the circumstances surrounding its discovery.'" United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993) (quoting United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990)).[5] This court has stated:

> [T]his Court does not require conclusive proof of authenticity before allowing the admission of disputed evidence. . . . Rule 901 does not limit the type of evidence allowed to authenticate a document. It merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.

Id. (quoting United States v. Jimenez-Lopez, 873 F.2d 769, 772 (5th Cir. 1989)).

The district court agreed that the ledger sheet is an authenticated record with respect to the financial transactions listed on it and we agree that circumstantial evidence supports this conclusion. First, the ledger sheet was attached to McLain's own motion for summary judgment, along with various other banking records. McLain does not present any additional evidence to qualify it or explain why it is inaccurate.[6] Thus, it constitutes an evidentiary admission with respect to the financial transactions listed on it, though Mclain remains free to controvert or explain it. See Martinez v. Bally's La., Inc., 244 F.3d 474, 476-77 (5th Cir. 2001) (defining "evidentiary admission" as "a statement of assertion or concession made for some independent purpose, . . . [which] may be controverted or explained by the party"); Medcom Holding Co.

---

[5] For example, in Acre, this court concluded that certain ledger sheets detailing drug transactions were authenticated based on evidence that they resembled drug ledgers from a known drug trafficker, were found in his home, and matched his handwriting. 997 F.2d at 1128.

[6] Interestingly, there is no discussion of the ledger sheet in the original motion for summary judgment. It simply appears as an exhibit to an affidavit.

v. Baxter Travenol Lab., 106 F.3d 1388, 1403-04 (7th Cir. 1997) (holding that defendant's financial statements containing information adverse to its defense does not constitute judicial admission, but does constitute evidentiary admission to be considered); United States v. Goldstein, 685 F.2d 179, 182 (7th Cir. 1982) (financial statements can be considered as evidentiary admissions). Such admissions "are received as substantive evidence of the facts admitted" and "no foundation . . . is mandated." 2 McCormick on Evidence §254, at 137 (5th ed. 1999); see also Fed. R. Evid. 801 (excluding admissions from hearsay rule). Second, the ledger sheet is consistent with other pieces of admissible evidence. For example, bank records indicate that between April 25, 2002 and April 29, 2002, the McLains withdrew $885 from their checking account in order to conceal it from the bankruptcy court. The ledger sheet begins with an entry for $885. The separate spreadsheet prepared by McLain and admitted as an exhibit to his deposition indicates that Brandi McLain was paid on a semi-monthly basis generally every fifteen days. The ledger sheet indicates that Brandi McLain received a paycheck on May 1, May 14, and May 31, 2002. Third, McLain stated that his wife received three paychecks during May of 2002. The ledger sheet confirms this fact. In fact, the ledger sheet mirrors the spreadsheet in many ways: same font, same font size, same syntax, and even the same misspelling of the word "billing" as "billling." The ledger sheet also includes a list of expenditures that is consistent with dates and amounts listed on the spreadsheet -- which refutes any notion that the ledger sheet is simply a list of fabricated transactions. Finally, the dates on the ledger sheet correspond precisely with the dates upon which the McLains admittedly concealed money from the bankruptcy court and decided to operate solely with cash on hand.[7]

---

[7] McLain argues that even if the ledger sheet is authenticated, it is still inadmissible because it lacks foundation. See Article II Gun Shop, Inc. v. Gonzales, 441 F.3d 492, 496 (7th Cir. 2006) (noting that just because evidence is authenticated does not mean it is admissible). According to him, there is no indication where the ledger sheet came from, who created it, or

Nonetheless, the district court concluded that there is no evidence that the ledger sheet is an authenticated record of all financial transactions between April 30, 2002 and July 11, 2002. Thus, according to the district court, although a reasonable jury could infer that the McLains had at least $1640 on May 1, 2002, there is no authenticated evidence that they did not spend all of that money as of the petition date, May 3, 2002. In short, according to the district court, Newhouse failed to provide any evidence to rebut the assertion that McLain and his wife had no meaningful cash as of May 3, 2002.

We disagree. First, the district court based its conclusion largely on the fact that the ledger sheet has less entries per month in comparison to the spreadsheet, which, according to the district court, lends doubt to its authenticity. It is true that several months on the spreadsheet have well over 15 entries per month and yet the ledger sheet only shows 9 entries for the month of May, 15 entries for the month of June, and 7 entries for the month of July. However, by the time June and July approached, the McLains' were no longer existing solely with cash on hand; they had since reopened their bank accounts, reactivated direct deposit, and started paying bills through their checking account. With respect to May, McLain specifically testified that he and his wife "attempted to limit our expenditures and preserve our cash." These facts easily explain why the ledger sheet has less entries per month in comparison to the number of entries on the spreadsheet for other months. In short, the fact that the ledger sheet allegedly shows less activity does not conclusively establish its lack of authenticity.

---

why it was created. However, the similarities between the ledger sheet and the spreadsheet, the latter of which was drafted by McLain himself, lend strong support for the notion that McLain also drafted the ledger sheet to keep track of his cash on hand. Cf. United States v. Gil, 58 F.3d 1414, 1419-20 (9th Cir. 1995) (relying, in part, on circumstantial evidence to establish foundation). Moreover, the ledger sheet was attached to his own motion for summary judgment and constitutes an evidentiary admission. See 2 McCormick on Evidence §254, at 137 (noting that evidentiary admissions do not require foundation).

Second, the district court ignored the titles of the columns on the ledger sheet. The final column is entitled, "Running Balance." According to the ledger sheet, there was an opening balance of $885. This is consistent with bank records that indicate that between April 25, 2002 through April 29, 2002, the McLains withdrew $885 from their bank account. The ledger sheet next indicates that Brandi McLain received her paycheck on May 1, 2002 for $1640. The running balance on the ledger sheet as of that date is $2525 ($1640 + $885). The ledger sheet does not indicate any expenditures between May 1, 2002 and the petition date, May 3, 2002. The next expenditure appears on May 4, 2002 for $91.19, which, according to the ledger sheet, leaves a running balance of $2,433.81 ($2525 - $91.19). Thus, a reasonable jury could infer based on the absence of entries between May 1, 2002, the date Brandi McLain received her paycheck, and May 3, 2002, the petition date -- coupled with the fact that the next expenditure on May 4, 2002 shows a running balance of $2,433.81 -- that the McLains had $2525 cash on hand as of the petition date, May 3, 2002. This evidence, when construed in a light most favorable to Newhouse, purports to show what financially occurred with this particular pool of cash and rebuts McLain's argument that he did not have any meaningful cash on hand as of the petition date.

In short, the ledger sheet is not just a random collection of transactions created by Newhouse out of thin air.[8] It is a document filed by McLain himself as an exhibit that carefully traces a running balance of cash on hand from May through July of 2002, the precise dates when the McLains decided to conceal funds from the bankruptcy court and operate solely in cash. Moreover, the ledger sheet in many respects mirrors the spreadsheet, which was admittedly

---

[8] Theoretically, there could have been alternative sources of income not reflected on the ledger sheet that would lend doubt to its authenticity, but McLain concedes that the only source of income during this time period was his wife's paychecks, which are accurately reflected on the ledger sheet.

drafted by McLain to keep track of his finances and admitted into evidence. Because "[t]his Court does not require conclusive proof of authenticity before allowing the admission of disputed evidence," Arce, 997 F.2d at 1128 (quoting Jimenez-Lopez, 873 F.2d at 772), we conclude that the ledger sheet is both authenticated and admissible. We also conclude that this evidence, when construed in a light most favorable to Newhouse, indicates that Brandi McLain received a pre-petition paycheck on May 1, 2002 and two post-petition paychecks on May 14 and May 31, 2002. Thus, as of May 14, 2002, the McLains were commingling pre-petition cash, which is part of the bankruptcy estate, with post-petition cash, which is not. See In re Clark, 960 F.2d 475, 477 (5th Cir. 1992) (stating that post-petition income is not part of the bankruptcy estate under 11 U.S.C. § 541(a)(1)). McLain concedes that the first premium payment was made from this pool of cash.[9] When construing this evidence in a light most favorable to Newhouse, a reasonable jury could infer that at least some portion of the first premium payment came from undisclosed pre-petition funds. In fact, the ledger sheet actually has an entry for an expenditure dated July 11, 2002 to WLC, which is the precise date McLain made the first premium payment. Thus, we conclude that the ledger sheet is authenticated and creates an issue of material fact as to whether McLain used undisclosed pre-petition funds to make the first premium payment on the Policy.

---

[9] Indeed, in his deposition, McLain concedes that he used money from his wife's non-direct deposited paychecks to make the first premium payment on the Policy. The only non-direct deposited paychecks were the three paychecks reflected on the ledger sheet, one pre-petition and two post-petition. Only later in his affidavit does he affirmatively state that the cash came from the two post-petition paychecks. However, his statement is merely conclusory. In his affidavit, he states that the money used to pay the first premium payment was "paid for with cash in my possession generated from my wife's paychecks - in other words, our post-petition income. As we had no cash in our possession as of the commencement date, the money orders I purchased for the first premium payment on the WCL policy were not paid for using cash which was in our possession prior to the commencement date." In short, McLain argues that he only could have used post-petition cash because he had no pre-petition cash. The evidence, however, when read in a light most favorable to Newhouse suggests otherwise.

Accordingly, we reverse the judgment of the district court and remand the case to the bankruptcy court to determine whether undisclosed, pre-petition funds were used to make the first premium payment on the Policy.

## B. Bankruptcy Issue

If the bankruptcy court, upon remand, determines that undisclosed, pre-petition funds were used to make the first premium payment, that court must then determine how that usage affects the outcome of this case. Previously, the bankruptcy court indicated, basing its opinion on Houston v. Edgeworth (Matter of Edgeworth), 993 F.2d 51 (5th Cir. 1993), and First Fid. Bank v. McAteer, 985 F.2d 113 (3d Cir. 1993), that such use of undisclosed, pre-petition funds could not have the effect of making any of the life insurance policy proceeds part of the bankruptcy estate or of depriving McLain of relief herein.[10] We disagree. Under some circumstances, the usage of undisclosed, pre-petition funds could have that effect. We will discuss those circumstances, but in doing so we intimate no decision with respect to the use of funds or affect upon the insurance proceeds in this case, which initially must be decided by the bankruptcy court.

The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The interest of the debtor as beneficiary of [a life insurance] policy is distinct from his ownership interest: each interest has certain rights and privileges. It is entirely within the contemplation of the statutory language that differing interests in the same property will accrue to an individual at different points in time." In re Poynor, 68 B.R. 919, 923 (Bankr. N.D. Tex. 1987) (citation omitted).

---

[10] We initially note that the bankruptcy court's reliance on Edgeworth and McAteer is misplaced. Neither case involved the use of bankruptcy estate funds to make premium payments on a life insurance policy. Thus, neither case addressed the issue of whether the use of such funds renders all or some of the policy proceeds part of the bankruptcy estate. The district court did not address this issue.

Thus, we must analyze what interest, if any, the bankruptcy trustee acquired by virtue of the various beneficiary and ownership interests at issue.

With respect to beneficiary interests, the bankruptcy estate includes:

Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date . . . as a beneficiary of a life insurance policy or of a death benefit plan.

11 U.S.C. § 541(a)(5)(C). Here, it is undisputed that McLain did not have a beneficiary interest in the Policy as of the petition date and that the Policy proceeds were not acquired until well over a year thereafter. Thus, the Policy proceeds did not become part of the bankruptcy estate by virtue of McLain's beneficiary interest under Section 541(a)(5)(C). Also, because the Policy was acquired post-petition, the proceeds could not become part of the bankruptcy estate by virtue of McLain's ownership interest under Section 541(a)(1). See In re Ballard, 238 B.R. 610, 622-23 (Bankr. M.D. La. 1999) ("Section 541(a)(1) excepts from the estate all (or almost all) legal or equitable interests of the debtor in property obtained or received post-petition, by including in the estate all legal and equitable interests of the debtor in property as of the commencement of the case."); see also In re Clark, 960 F.2d at 477 (stating that post-petition income is not part of the bankruptcy estate under 11 U.S.C. § 541(a)(1)).

However, our inquiry does not end there. The bankruptcy estate also includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. § 541(a)(6). "This generous provision sweeps into the bankruptcy estate all interests held by the debtor -- even future, non-possessory, contingent, speculative, and derivative interests." In re Dibiase, 270 B.R. 673, 676 (Bankr. W.D. Tex. 2001). Congress intended this provision to be quite broad, not limited to the definition of "proceeds" set forth in the Uniform Commercial

Code, "but encompassing any conversion in the form of property of the estate, and anything of value generated by property of the estate." In re Hanley, 305 B.R. 84, 86-87 (Bankr. M.D. Fla. 2003) (quoting S. Rep. No. 95-898, at 82 (1978); H.R. Rep. No. 95-595, at 368 (1977), as reprinted in 1978 U.S.C.C.A.N. 5787). The bankruptcy estate also includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). "Congress enacted § 541(a)(7) to clarify its intention that § 541 be an 'all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate.'" In re Hanley, 305 B.R. at 87 (quoting 124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978) (statements of Rep. Edwards); 124 Cong. Rec. S17413 (daily ed. Oct. 6, 1978) (statements of Sen. DeConcini)). Thus, by virtue of these two provisions, if undisclosed pre-petition funds, i.e., property of the bankruptcy estate, were used to generate some type of property interest, that subsequent property interest is part of the bankruptcy estate and reachable by McLain's creditors.

State law governs the question of whether the use of pre-petition funds to make the first payment on a term life insurance policy creates some type of property interest on the part of the bankruptcy estate. See Travelers Cas. & Sur. Co. of Am. v. PG&E, 127 S. Ct. 1199, 1205 (2007) (internal quotations and citation omitted) ("Indeed, we have long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law."); see also Peoples State Bank v. GE Capital Corp. (In re Ark-La-Tex Timber Co.), 482 F.3d 319, 329 n.9 (5th Cir. 2007); In re: Louisiana World Exposition, 858 F.2d at 252; In re Dibiase, 270 B.R. 673, 680 (Bankr. W.D. Tex. 2001).

Texas law, which is applicable in this case, follows the majority of jurisdictions in holding that "a person who wrongfully uses stolen or

14

fraudulently obtained funds to purchase an insurance policy shall hold that policy and its proceeds in trust for the benefit of the one from whom the funds were stolen or taken." Marineau v. Gen. American Life Ins. Co., 898 S.W.2d 397, 402 (Tex. App. 1995); see also Paschal v. Great W. Drilling, Ltd., 215 S.W.3d 437, 444-45 (Tex. App. 2006). "This may be true even where a statute protects the proceeds of insurance policies from actions by creditors." Id. at 401. Thus, under Texas law, the use of funds wrongfully obtained to make premium payments on an insurance policy creates a property interest in the proceeds of that policy on behalf of the owner of the funds wrongfully obtained. Brown v. Lee, 371 S.W.2d 694, 696 (Tex. 1963) ("[T]he right to receive insurance proceeds payable at a future but uncertain date is 'property.'"); see also Marineau, 898 S.W.2d at 401-02.

In Marineau, the court also adopted the holding of the Oklahoma Supreme Court that the owner of the funds wrongfully obtained is "entitled to a pro rata share of the life insurance policy proceeds where the wrongfully acquired funds were partially used to pay the premiums." Id. at 403 (citing G & M Motor Co. v. Thompson, 567 P.2d 80, 84 (Okla. 1977)). The test relied upon by the Oklahoma Supreme Court and adopted in Marineau is derived from Section 210 of the Restatement on Restitution, which states:

> (1) Where a person wrongfully mingles money of another with money of his own and with the mingled fund acquires property, the other is entitled to an equitable lien upon the property to secure his claim for reimbursement.
>
> (2) If the wrongdoer knew that he was acting wrongfully, the other is entitled at his option to a share of the property in such proportion as his money bore to the whole amount of the fund.

Restatement of the Law (Restitution) § 210 (1937). The drafters of this provision (and an analogous provision) explained the rationale behind this rule:

Where a person by the consciously wrongful disposition of the property of another acquires other property, the person whose property is so used is not only entitled to hold the wrongdoer personally liable for the value of the property wrongfully disposed of but he is entitled as an alternative to the property so acquired. If the property so acquired is or becomes more valuable than the property used in acquiring it, the profit thus made by the wrongdoer cannot be retained by him; the person whose property was used in making the profit is entitled to it. The result, it is true, is that the claimant obtains more than the amount of which he was deprived, more than restitution for his loss; he is put in a better position than that in which he would have been if no wrong had been done to him. Nevertheless, since the profit is made from his property, it is just that he should have the profit rather than that the wrongdoer should keep it. It is true that if there had been a loss instead of a profit, the wrongdoer would have had to bear the loss, since the wrongdoer would be personally liable to the claimant for the value of the claimant's property wrongfully used by the wrongdoer. If, however, the wrongdoer were permitted to keep the profit, there would be an incentive to wrongdoing, which is removed if he is compelled to surrender the profit. The rule which compels the wrongdoer to bear any losses and to surrender any profits operates as a deterrent upon the wrongful disposition of the property of others. Accordingly, the person whose property is wrongfully used in acquiring other property can by a proceeding in equity reach the other property and compel the wrongdoer to convey it to him. The wrongdoer holds the property so acquired upon a constructive trust for the claimant.

Restatement of the Law (Restitution) § 202 cmt. C (1937).[11]

---

[11] That this rule of law is derived from the Restatement on Restitution does not change the fact that under Texas law, the wrongful use of funds to make a premium payment on a life insurance policy creates a property interest in the proceeds of that policy on behalf of the owner of the funds wrongfully obtained. Thus, the fact Newhouse does not seek restitution in his complaint is immaterial. Moreover, this rule of law is well-settled outside the context of restitution, as recognized by a major treatise on insurance. See Couch on Insurance § 74:38, at 53 ("When the premiums of a life insurance policy are paid in part with embezzled funds, the owner of the embezzled money is entitled to the proceeds of the policy, as against the beneficiaries, in the proportion in which the funds so appropriated paid the premiums.").

In Paschal, the court noted that these principles of law are also consistent with the majority view of this area of insurance law:

> Where funds of another have been misappropriated and used to purchase, or pay premiums on, life insurance, the courts will generally allow the one whose funds were misused some form of recovery. Generally, courts will impress either a constructive or a resulting trust on the proceeds of life insurance, or a lien on the proceeds in favor of one whose money was wrongfully used to pay premiums.

215 S.W.3d at 444 (quoting 5 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 74:37, at 50-51 (3d ed. 1997)). Thus, under Texas law, in accordance with the Restatement and the majority of jurisdictions, the wrongful use of funds to make premium payments on a life insurance policy creates a property interest in the proceeds of that policy on behalf of the owner of the funds wrongfully obtained. Whether the owner of the funds wrongfully obtained is entitled to a pro rata share or simply reimbursement of the funds wrongfully obtained depends on the culpability of the person who wrongfully used those funds.[12] We see no reason why Texas courts would depart from these general principles of law in cases in which a bankruptcy debtor wrongfully uses funds that belong to the bankruptcy estate to make premium payments on a life insurance policy. Moreover, the fact that the Policy is a term life insurance policy is immaterial. Indeed, in Paschal, the plaintiff-employer sought to impose a constructive trust on the proceeds of five term life insurance policies of a deceased employee who used embezzled funds to make premium payments on the policies. 215 S.W.3d at 442. The court, citing Marineau, affirmed the trial court's imposition of a

---

[12] "For example, the mere fact that the premiums have been paid with checks which were drawn in excess of the depositor's bank account does not constitute a diversion of the bank's funds so as to give it a claim against the proceeds of insurance." Couch on Insurance § 74:37, at 51.

constructive trust on the proceeds on behalf of the employer notwithstanding the fact that the policies at issue involved term life insurance. Id. at 444-45, 457.

That McLain has since been discharged from bankruptcy does not change the result in this case. Generally, "[u]nless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of Section 350 of this title." 11 U.S.C. § 554(c). However, the bankruptcy code also places an affirmative duty on the debtor to schedule his assets and liabilities and cooperate with the trustee. See 11 U.S.C. §§ 521(1)-(3). If the debtor fails to do so, those assets continue to belong to the bankruptcy estate and do not revert to the debtor upon discharge. See Cusano v. Klein, 264 F.3d 936, 945-46 (9th Cir. 2001); Hutchins v. IRS, 67 F.3d 40, 43 (3d Cir. 1995); Vreugdenhill v. Navistar Int'l Transp. Corp., 950 F.2d 524, 526 (8th Cir. 1991).

Finally, McLain argues that even if his wife received a pre-petition paycheck, it would have been considered exempted property under Tex. Prop. Code § 42.001(b)(1). However, as the district court correctly noted, the McLains never claimed any exemptions. "[P]roperty that is entitled to be exempted is initially regarded as estate property until it is claimed and distributed as exempt." Cyrak v. Poynor, 80 B.R. 75, 79 (N.D. Tex. 1987); see also In re Poynor, 68 B.R. at 921 ("Even exempt property must initially be regarded as property of the estate and then claimed and distributed as exempt") (citing In re McAllister, 56 B.R. 164, 166 (Bankr. D. Ore. 1985) and In re Hendricks, 11 B.R. 48, 50 (Bankr. W.D. Mo. 1981)); Carlucci & Legum v. Murray (In re Murray), 249 B.R. 223, 230 (Bankr. E.D.N.Y. 2000) ("Property is not exempt by fiat of the debtor, but only through a process of compliance with the statutory disclosures and then by order of the bankruptcy court[.]"). McLain cannot now retroactively claim an exemption for undisclosed pre-petition cash. Payne v. Wood, 775 F.2d 202, 205 (7th Cir. 1985) ("The partition between debtors and estate depends on what was

actually exempted, not what could have been exempted."); Sheehan v. Lincoln Nat'l Life, 257 B.R. 449, 453 (Bankr. N.D.W. Va. 2001) (citing In re Dorricott, 5 B.R. 192, 194 (Bankr. N.D. Ohio 1980) ("A debtor may not claim as exempt property which he knowingly concealed and failed to disclose to the trustee, even if the property would have been exempt had it been property scheduled and claimed."). This rule makes sense because a debtor should not be permitted to conceal property from the bankruptcy court on the theory that it is exempted property only to claim a retroactive exemption if the deception is later discovered. As the Seventh Circuit explained:

> The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive. . . . When it is hard to detect an effort to evade the law, the penalty must exceed the profits of the evasion. So, here, it is too late for the [debtors] to start over and ask the court to apportion the proceeds as if they had filed a complete schedule in the first instance.

Payne, 775 F.2d at 205 (citations omitted). We too have emphasized the importance of full disclosure in bankruptcy proceedings. See Brown Mfg. v. Mims (In the Matter of Coastal Plains, Inc.), 179 F.3d 197, 208 (5th Cir. 1999) ("Viewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized.").

In sum, we conclude that if undisclosed pre-petition funds were used to make the first premium payment on the Policy, Newhouse may have a property interest in some portion of the proceeds under Texas law. See Paschal, 215 S.W.3d at 444-45; Marineau, 898 S.W.2d at 401-03. If the funds used to make the first premium payment can be traced to undisclosed pre-petition funds, the bankruptcy court must determine whether Newhouse is entitled to a pro rata share of the insurance proceeds or to simply reimbursement of the funds wrongfully obtained. That determination hinges on (a) whether McLain had the

requisite level of culpability to entitle Newhouse to a pro rata share and (b) whether McLain is entitled to the reliance on counsel defense.[13]

## IV. CONCLUSION

For the foregoing reasons, the decisions of the district and bankruptcy courts are REVERSED and this matter is REMANDED to the bankruptcy court for proceedings consistent with this opinion.

REVERSED and REMANDED.

---

[13] See Gebhardt v. Gartner (In re Gartner), 326 B.R. 357, 374 (Bankr. S.D. Tex. 2005) (noting that defense of reliance on counsel is only available when reliance is reasonable and in good faith and that reasonableness of reliance is undermined where debtor admits under oath to having read and signed challenged schedules and where there is evidence of debtor's intent to omit information from bankruptcy petition).