Opinion filed February 12, 2015



## In The

# Eleventh Court of Appeals

_____

## No. 11-13-00039-CV

_____

## EDITH CHERRY, CARRIS BOOKER, AND CABOE RETURNS & INVESTMENTS, INC., Appellants

## V.

## TRAVOY R. HOLLIE, Appellee

### On Appeal from the 352nd District Court

### Tarrant County, Texas

### Trial Court Cause No. 352-250906-11

### MEMORANDUM OPINION

This is an appeal from a judgment of the trial court in favor of Travoy R. Hollie in which it awarded Hollie actual and exemplary damages arising from the unauthorized use of Hollie's money and the misappropriation of stocks by Edith Cherry and Carris Booker. We reverse and remand.

Hollie is Booker's son. Booker was not involved in Hollie's life when he was a child, but Hollie and his father began to speak more frequently as he got older. In 2007, Hollie was an over-the-road driver for C.R. England, Inc., an authorized for-hire motor carrier. Booker called Hollie and asked if he could ride with him because he "just want[ed] to get away." Hollie "loved" that idea and Booker rode with him for approximately thirty days. During that time, they talked and connected. It was also during that time that Booker told Hollie that he was broke and owed the IRS money. Hollie asked Booker whether he still invested money in stocks, and Booker told him that he did. Booker explained that he had an investment company and that Cherry, Hollie's aunt, was the president because he could not have any dealings with money due to his situation with the IRS. Booker said that the company, Caboe Returns & Investments, Inc., was idle and that Hollie could use the company to buy and sell stocks. Hollie offered to give Booker $5,000 to go toward Booker's debt to the IRS if Booker would invest in stock for Hollie. Hollie wanted Booker to invest his money so that he could use the money for his kids.

In February 2008, Hollie gave Booker access to his money through a Comdata card issued by C.R. England, the company for which Hollie worked. C.R. England deposited Hollie's paycheck onto the card instead of issuing him a check. Hollie could write checks from the account connected with the card, and he could also withdraw money using the card at ATMs; he could not use the card to make direct purchases from merchants. Hollie gave Booker permission to use the card to withdraw money for several specific purposes: (1) to pay Hollie's bills; (2) to give money to Hollie's children when Hollie directed Booker to do so; (3) to set aside money for future stock purchases; and (4) to pay himself $5,000 to go toward his debt to the IRS. Regarding the money for future stock purchases, Hollie testified that he, Booker, and Cherry discussed how the stock would be

purchased and determined that Hollie was to give the money to Booker and Booker was to then give the money to Cherry. Cherry was to deposit that money into an investment account with Banc of America and take that money from the Banc of America account and deposit it into a stock trading account with Merrill Lynch.[1] The stock trading account was held in Caboe's name. Booker recommended that Hollie purchase stocks from Advanced Cell Technology (ACTC), and Hollie agreed. Hollie estimated that Booker withdrew $20,000 from his Comdata card to purchase the stock for him. Booker purchased a total of 400,000 shares. Hollie believed that he would control the stock investments and that he would make any final decisions in connection with the stock.

Cherry was the sole shareholder of Caboe, but both she and Booker were officers. Cherry and Booker made Hollie secretary-treasurer of Caboe in August 2008. Hollie believed that he was a part owner of the company. Because of this belief, Hollie transferred ownership of his truck to Caboe. He believed that he was transferring the truck into his company and that he had control over transferring the truck out of the company if and when he wanted. Hollie also signed a new independent contractor agreement with C.R. England on November 21, 2008. He did not sign the agreement individually but, rather, on behalf of Caboe; the new agreement was therefore between Caboe and C.R. England. When he signed the agreement, he believed that he owned Caboe, that he was signing for himself, and that he represented Caboe. Cherry set up a bank account with Wachovia, account number ending in 2032, for Hollie to use so that the money from C.R. England related to the trucking operations could be deposited into the account. The Wachovia 2032 account was in Caboe's name. Hollie believed that the account

---

[1]It appears from the record that Cherry would make deposits into a Banc of America investment account from a Wachovia account ending in 4396. In 2009, the Banc of America investment account was transferred into a Merrill Lynch investment account after a merger. All three accounts were held in Caboe's name.

was opened for him and that he controlled the money in the account. Hollie, Booker, and Cherry all had access to the account, and each had a separate debit card for the account.

Cherry prepared tax returns and conducted audits for a living and, according to Hollie, offered to prepare Hollie's tax returns for 2003 through 2007 at no cost. Hollie and Cherry talked about Cherry preparing his 2008 and 2009 tax returns, but she never prepared them. As a result, Hollie hired Karen Frizell in May 2010 to prepare his 2008 and 2009 tax returns. The relationship between Hollie and Cherry turned sour when Hollie and Frizell tried to get information from Cherry for Hollie's tax returns. Cherry told Hollie to get out of the company, and he was removed as secretary-treasurer. Hollie was not aware that Cherry removed him as an officer of the company. After the disagreement with Cherry, Hollie wanted the stock transferred from Caboe to him, but Cherry and Booker refused to transfer the stock until he transferred the title of his truck out of Caboe's name. Eventually, Hollie was able to transfer the truck title out of Caboe's name and into his own name; however, Cherry and Booker would not transfer the stock to him. They did offer to give him $19,600, the amount they claimed to have been used to purchase the stock. Hollie sent a letter to Cherry and Booker telling them not to sell the stock until he was present. In December 2010, the stock was transferred into a new Merrill Lynch account. The new account was held by Cherry and Booker, individually, as joint tenants with the right of survivorship.

During the preparation of Hollie's tax returns, Frizell and Hollie discovered that money had been taken out of the Comdata account as well as the Wachovia 2032 account without Hollie's permission. Frizell ultimately testified that Cherry and Booker used $31,120.30 of Hollie's money without authorization.[2]

---

[2]Frizell testified to several different amounts as the amount that Booker and Cherry withdrew without Hollie's permission. The amount of $31,120.30 was the last amount that she calculated.

4

Hollie filed suit against Booker, Cherry, and Caboe and alleged the following causes of action: constructive fraud, breach of fiduciary duty, conversion, common-law fraud and misrepresentation, violation of the Deceptive Trade Practices Act (DTPA), breach of contract, and civil conspiracy. Hollie sought declaratory judgment, actual damages, punitive damages, specific performance, attorney's fees, and prejudgment interest. Appellants filed a motion for summary judgment, and the trial court granted Appellants' motion as to Hollie's cause of action for declaratory judgment and denied Appellants' motion as to all other causes of action asserted by Hollie. The case proceeded to trial, and after Hollie rested, Appellants moved for a directed verdict on each of Hollie's causes of action. The trial court granted Appellants' motion as to Hollie's claims for breach of fiduciary duty and for a violation of the DTPA. The trial court denied Appellants' motion as to the remaining causes of action, and the case proceeded on the following causes: conversion, common-law fraud and misrepresentation, breach of contract, and civil conspiracy. At the conclusion of the trial on the merits of the remaining claims, the trial court entered a judgment in favor of Hollie in accordance with its findings of fact and conclusions of law. The trial court awarded Hollie $114,320 in actual damages, $50,000 in exemplary damages, $52,000 in attorney's fees, prejudgment interest, and postjudgment interest.

Appellants present two issues for our review. In their first issue, Appellants contend that Hollie was not entitled to the "highest intermediate value" of shares in the stock at issue. Appellants assert in their second issue that the evidence was legally and factually insufficient to support the trial court's judgment.

We will first address Appellants' challenge to the sufficiency of the evidence. Appellants specifically argue that there was insufficient evidence to show that they conspired to accomplish any wrongful purpose, that Cherry herself

converted $31,120, that Booker converted $31,120, that Booker's breach of the agreement damaged Hollie in the amount of $31,120 or $114,320, and that Cherry acted in a manner which shocked the conscience. Appellants also argue that the trial court awarded an incorrect amount of damages because the court could not have concluded that all of the proceeds from Hollie's trucking endeavors belonged to him individually and, thus, that Hollie failed to show what specific money of his was converted. Appellants ask us to vacate the awards of attorney's fees and punitive damages because the record does not support the judgment for actual damages.

A trial court's findings of fact in a bench trial are reviewed for legal and factual sufficiency under the same standards used to review a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In considering a legal sufficiency challenge, we review all the evidence in the light most favorable to the trial court's judgment and indulge every reasonable inference in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit any favorable evidence if a reasonable factfinder could, and we disregard any contrary evidence unless a reasonable factfinder could not. *Id.* at 821–22, 827. In reviewing a factual sufficiency challenge, we consider all of the evidence and uphold the finding unless it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Of the remaining causes of action presented to the trial court, there are only three causes of action on which the trial court made findings of fact and conclusions of law: breach of contract and conspiracy—as to the money and the stock—and conversion as to the money. Because Appellants attack specific findings that correspond with specific elements of each of these causes of action, we will address each cause of action in turn beginning with Hollie's claim against Booker for breach of contract. We believe that it is important to note that the trial

6

court did not make any findings regarding a breach of contract claim against Cherry, a claim for conversion of the stock against Booker and Cherry, or a claim for fraud against Booker and Cherry. The trial court also did not make any findings on any cause of action against Caboe, and it did not enter a judgment against Caboe. In the judgment, the trial court "ORDERED that all relief not expressly granted in this judgment be denied."

The trial court made the following pertinent findings of fact regarding the breach of contract claim against Booker: (1) Hollie entered into an agreement with Booker, whereby Booker would use Hollie's money to invest by buying and managing stocks for Hollie, to pay Hollie's personal bills for a period of time, and to make gifts to Hollie's children at Hollie's direction; (2) Booker breached the agreement by withdrawing additional sums of money belonging to Hollie without Hollie's permission and by using the additional money for his own purposes; (3) Booker also breached the agreement by "misappropriating the ACTC stock purchased with Hollie's money"; and (4) Booker's breach of the agreement caused damages to Hollie in the sum of $31,120, plus the appreciated value of the 400,000 shares of stock in the amount of $83,200.

Appellants argue that there was no evidence, or insufficient evidence, that Booker's alleged breach of the contract damaged Hollie in the sum of $31,120 or $114,320 because Frizell was not always able to link withdrawals from the Comdata card to expenditures by Booker and because Frizell agreed that she could not account for all the money spent by Booker on Hollie's expenses. We agree that the evidence does not support a finding of damages for either of these amounts. We note that Appellants' complaint as to the $114,320 in damages includes the $31,120. The amount of $114,320 was the total amount of actual damages awarded by the trial court: $31,120 for money used without Hollie's permission and $83,200 for the appreciated value of the stock. Although

7

Appellants do not challenge the evidence as to the $83,200 in this issue, Appellants do challenge, in a separate issue, whether an award of $83,200, based on the highest intermediate value of the stock between the date of conversion and the lawsuit, is the proper measure of damages. We will address this issue later in our opinion.

Here, the record shows that, after Frizell had reviewed various bank statements, she calculated that Booker withdrew $28,686.75 from Hollie's Comdata card in 2008 and that $33,784.09 was withdrawn from the Wachovia 2032 account. Thus, Frizell determined that the total amount withdrawn by Cherry and Booker was $62,470.84, a part of which was approved by Hollie. Frizell deducted from the amount withdrawn an amount for Hollie's authorized expenses, including $16,553.76 to purchase stocks, $5,000 to Booker to help with the IRS debt, $600 to Hollie's children, $114.78 for a withdrawal by Hollie that Frizell initially classified as a withdrawal by Booker, and $9,082 for Hollie's bills. Frizell used these deductions to conclude that Cherry and Booker used $31,120.30 of Hollie's money without Hollie's permission.

However, Frizell also testified that she did not know how much money Booker used from the Comdata card to pay Hollie's bills, but she agreed that Booker used money from that card for those authorized purposes. The amount of $9,082 that Frizell calculated Booker used to pay Hollie's bills was withdrawn from the Wachovia 2032 account. While there is evidence that showed that Booker's breach of the agreement damaged Hollie in some amount, there is factually insufficient evidence to support an award of $31,120 because Frizell admitted that Booker used some of the $31,120 to pay Hollie's bills from the Comdata card but was unsure of what amount was used. The trial court's finding that Hollie was damaged by an amount of $31,120 is against the overwhelming weight of the evidence and is clearly wrong and unjust. *See Cain*, 709 S.W.2d at

8

176. Because Frizell did not testify as to the amount of bills that were paid from the Comdata card and did not testify as to what further amount should have been deducted from the total amount withdrawn, we cannot determine from the record the appropriate amount of damages regarding Booker's breach of the agreement. Therefore, we must remand the breach of contract cause of action to the trial court. *See* TEX. R. APP. P. 44.1(b) (a court may not order a separate trial on unliquidated damages if liability is contested).

We next address Appellants' challenge to the trial court's findings regarding Hollie's claim for conversion of his money as presented by Appellants. Specifically, Appellants again raise a challenge to the amount of damages awarded by the trial court, and they also contend that Hollie did not establish title or a possessory right to the funds that Caboe received from C.R. England under the independent contractor agreement.

Regarding the claim for conversion of money, the trial court found that Hollie owned, possessed, and had an ongoing right to immediate possession and control of the monies that he earned and received as income; that Hollie allowed Booker access to his funds for use and safekeeping to Hollie's benefit; that Hollie intended for the funds to be segregated; that Booker kept the funds in substantially the same form as they were received and in a substantially intact fund; that neither Booker, Cherry, nor Caboe had a legitimate claim of title to Hollie's funds; and that Booker and Cherry wrongfully converted Hollie's money causing damage to Hollie in the amount of $31,120.

Conversion is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971). To establish conversion of property, the plaintiff must prove that he owned, had legal possession of, or was entitled to possession of the property. *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707

9

(Tex. App.—San Antonio 1997, pet. denied). Similarly, to establish a claim for conversion of money, the plaintiff must show that the money is not the subject of a title claim by its keeper. *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 456 (Tex. App.—Eastland 2006, pet. denied).

Here, the evidence showed that C.R. England deposited money into the Wachovia 2032 account based on an independent contractor agreement that Caboe held with C.R. England. Although Hollie signed the agreement on Caboe's behalf, the agreement named Caboe as the independent contractor. Thus, the money deposited into the Wachovia 2032 account after the independent contractor agreement became effective on November 21, 2008, belonged to Caboe, a separate legal entity. The bank statements for the Wachovia 2032 account show that the account was opened on October 15, 2008, and that an initial deposit of $200 was made on that date. There is no evidence in the record as to the origin of the initial $200 deposit. The next deposit into the account was on November 25, 2008, in the amount of $369.54. This amount was an automated credit from C.R. England and was made after Hollie signed the independent contractor agreement on behalf of Caboe. Multiple deposits were subsequently made into the account by C.R. England. Because Caboe was listed as the independent contractor in the agreement and it was Caboe that C.R. England agreed to pay under the independent contractor agreement, Hollie did not show that he had a right of possession to all of the money in the Wachovia 2032 account. Therefore, the amount of $31,120 that Frizell calculated was withdrawn from both the Comdata card and the Wachovia 2032 account without Hollie's permission is not supported by the evidence.

Hollie failed to show that he was entitled to the money in the Wachovia 2032 account; therefore, the money from that account will not support an award for conversion. As to the money from the Comdata account, Frizell admitted that she did not deduct the amount of money Booker spent on Hollie's bills out of the

Comdata card from the total amount withdrawn; therefore, as we held with regard to the breach of contract claim, the evidence is factually insufficient to support an award of $31,120. Because we cannot determine from the record the amount of Hollie's money that was converted by Booker and Cherry from the Comdata card, we must also remand the conversion cause of action, as to the money converted from the Comdata account, to the trial court. *See* TEX. R. APP. P. 44.1(b) (a court may not order a separate trial on unliquidated damages if liability is contested).

As to Hollie's cause of action for conspiracy, Appellants contend that Hollie did not prove that they had a meeting of the minds with respect to the accomplishment of any wrongful purpose. The trial court found that Booker and Cherry committed conversion in concert with one another as both had knowledge of, agreed to, and intended a common objective and course of action constituting conversion that resulted in damage to Hollie; that Booker and Cherry each benefited from the actions of the other and that both performed acts to further the conspiracy; that Booker and Cherry jointly and proximately caused actual damages to Hollie in the sum of $31,120, plus the appreciated value of the stock in the amount of $83,200, as a result of such conspiracy to commit conversion; that Booker and Cherry committed the conspiracy wrongfully and in bad faith and that such conduct was of a wanton and malicious nature; and that exemplary damages in the amount of $50,000 would be appropriate to punish Booker and Cherry for committing conspiracy wrongfully and in bad faith.

To prevail on a claim for civil conspiracy, a plaintiff must show that two or more persons sought to accomplish an unlawful purpose or sought to accomplish a lawful purpose by unlawful means that proximately caused damages to the plaintiff. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Civil conspiracy is a derivative tort and is dependent on participation in an underlying statutory violation or tort, other than negligence. *Chu v. Hong*, 249 S.W.3d 441,

11

444–47 (Tex. 2008); *Tri v. J.T.T.*, 162 S.W.3d 552, 557 (Tex. 2005); *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Here, the trial court found that Cherry and Booker conspired to convert; thus, the underlying tort was conversion. Because we have held that Hollie failed to show that he was entitled to the money deposited into the Wachovia 2032 account by C.R. England, Booker and Cherry could not have committed a conversion as to the Wachovia 2032 account. However, the trial court's finding that Booker and Cherry converted $31,120 of Hollie's money includes the money from Hollie's Comdata account. Thus, Booker's unauthorized use of some of the money from the Comdata account would support the underlying tort of conversion.[3] However, because we have found that the damages that the trial court awarded in connection with the conversion cause of action are not supported by sufficient evidence and because we must remand the conversion cause of action to the trial court, we will also remand the conspiracy cause of action as it relates to the conversion of money from the Comdata account.

To summarize, we hold that there was insufficient evidence to support an award of damages in the amount of $114,320, based on our discussion regarding the amount of $31,120 as it relates to the breach of contract cause of action and the conversion cause of action, and we decline to address the sufficiency of the evidence as it relates to the conspiracy cause of action because we are remanding the underlying conversion cause of action. Therefore, as to Appellants' second issue, we overrule Appellants' legal sufficiency challenge and sustain Appellants' factual sufficiency challenge.

---

[3]We note that, while the trial court found that neither Booker, Cherry, nor Caboe had a legitimate claim of title to the stocks purchased with Hollie's funds, the trial court did not specifically conclude that Booker and Cherry converted the stock; the trial court found that Booker breached the agreement by misappropriating the ACTC stock purchased with Hollie's money and concluded that Booker's breach caused damage to Hollie in the amount of $114,320.

In their first issue, Appellants contend that Hollie was not entitled to the highest intermediate value of the stock. The highest intermediate value of the stock can be the proper measure of damages in a conversion case. *See Reed v. White, Weld, & Co.*, 571 S.W.2d 395, 397 (Tex. Civ. App.—Texarkana 1978, no writ). However, the trial court did not conclude that the stock was converted. The trial court's findings as to the stock are as follows: Booker and Cherry used $16,553.76 of Hollie's money to buy 400,000 shares of ACTC stock on behalf of Caboe, utilizing Caboe's brokerage account; the ACTC stock appreciated in value after its purchase; the stock's highest market value between the date of the stock purchase in 2010 and the date the lawsuit was filed in 2011 was $83,200; and Booker breached the agreement by misappropriating the ACTC stock purchased with Hollie's money. Because the trial court did not find that Booker and Cherry converted the stock but, instead, found that Booker breached his agreement with Hollie by misappropriating the stock, the highest intermediate value of the stock cannot be the proper measure of damages. It does not appear from the record that the parties ever presented arguments as to the proper measure of damages based on Booker's breach of the agreement by misappropriating the stock. Therefore, we sustain Appellants' first issue.

Appellants also argue that, if we reverse on the measure and amount of damages, we must remand the trial court's award of attorney's fees and exemplary damages so that the trial court can recalculate those awards while taking the new amount of damages into consideration. We agree that the trial court must reconsider the amount of its award of attorney's fees and exemplary damages after it determines the appropriate amount of actual damages to award.

In a cross-point, Hollie requests a hearing to receive evidence in the event we sustain one of Appellants' issues. Due to our disposition of this appeal, Hollie's cross-point is moot.

We reverse the trial court's judgment, and we remand this cause to the trial court for further proceedings not inconsistent with this opinion.


JIM R. WRIGHT

CHIEF JUSTICE


February 12, 2015

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.